ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsarroyo.com
FELIPE J. ARROYO (163803)
farroyo@robbinsarroyo.com
STEVEN R. WEDEKING (235759)
swedeking@robbinsarroyo.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH LIPOVICH, Derivatively on Behalf of INTEL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BRIAN M. KRZANICH, ROBERT H. SWAN, ANDY D. BRYANT, ANEEL BHUSRI, DAVID B. YOFFIE, DAVID S. POTTRUCK, REED E. HUNDT, CHARLENE BARSHEFSKY, FRANK D. YEARY, TSU-JAE KING LIU, OMAR ISHRAK, GREGORY D. SMITH, and ANDREW WILSON, <br><br> Defendants, <br><br> -and- <br><br> INTEL CORPORATION, a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

<u>**NATURE AND SUMMARY OF THE ACTION**</u>

1.      This is a stockholder derivative action brought by plaintiff, a stockholder of Intel Corporation ("Intel" or the "Company"), on behalf of the Company against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in billions of dollars in damages to Intel's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Intel is a technology company that focuses on the development and manufacturing of semiconductor chips and is the world's second largest chip maker.  It is the inventor of the x86 series of microprocessors, the processors found in most personal computers.  The Company also manufactures motherboard chipsets, network interface controllers and integrated circuits, flash memory, graphics chips, embedded processors, and other devices related to communications and computing.  Intel supplies processors for computer system manufacturers such as Apple, Lenovo, HP, and Dell.

3.      On or around June 1, 2017, the Board of Directors (the "Board") and executive management at Intel became aware of certain security vulnerabilities in its architecture of its chips.  Employing attack techniques known as "Meltdown" and "Spectre," researchers identified two major flaws in the basic architecture of Intel chips that would allow malicious programs to steal sensitive data, such as passwords, proprietary information, or encrypted communications processed in the computer's normally isolated core.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

4. For approximately six months, Intel withheld from the public information about the security threats posed to the millions of devices containing the Company's chips. Although Intel withheld this information from the Company's investors and the public, including the United States Department of Homeland Security and the National Security Administration, Intel did however inform a small group of its customers, including the Chinese companies Lenovo and Alibaba.

5. Despite knowing of these chip flaws, between June 2017 and January 3, 2018, Intel publicly and steadily touted the Company's financial performance as well the integrity of its chips. Moreover, during the relevant period, certain members of Intel's Board reaped substantial profits from the sale of their Intel stock while in possession of damaging, nonpublic material information regarding the security flaw.

6. On January 3, 2018, Intel finally released a public statement acknowledging the flaw in the design of its chips, but only after the problem was identified and publicized by independent software researchers. The initial disclosure by the Company provided little information about the pervasiveness of the problem and the impact the Company's suggested fix would have on the millions of devices relying on Intel chips.

7. Analysts quickly and accurately concluded that the suggested fixes for the problem would have a negative impact on the performance of the impacted computers. Analysts also warned that the performance costs would ultimately be borne by Intel.

8. Following the disclosures, Intel's share price fell $1.59, or over 3.3%, to close at $45.26 per share on that day, shedding over $7.4 billion in market capitalization. In addition to the market losses, Intel now faces at least thirty consumer class action lawsuits that have been filed against it over the issue, and two securities class actions lawsuits.

## JURISDICTION AND VENUE

9. Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity exists and the amount in controversy exceeds $75,000, exclusive of costs.

10. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this

1  District, or is an individual who has sufficient minimum contacts with this District to render the

2  exercise of jurisdiction by the District courts permissible under traditional notions of fair play

3  and substantial justice.

4      11.     Venue is proper in this Court in accordance with 28 U.S.C. §1339 because:

5  (i) Intel maintains its principal place of business in this District; (ii) one or more of the

6  defendants either resides in or maintains executive offices in the District; (iii) a substantial

7  portion of the transactions and wrongs complained of herein, and aiding and abetting and

8  conspiracy in violation of fiduciary duties owed to Intel, occurred in this District; and (iv)

9  defendants have received substantial compensation in this District by doing business here and

10  engaging in numerous activities that had an effect in this District.

11                                    **INTRADISTRICT ASSIGNMENT**

12      12.     A substantial portion of the transactions and wrongdoings that gave rise to the

13  claims in this action occurred in the County of Santa Clara, and as such, this action is properly

14  assigned to the San Jose division of this Court.

15                                             **THE PARTIES**

16  **Plaintiff**

17      13.     Plaintiff Joseph Lipovich was a stockholder of Intel at the time of the wrongdoing

18  complained of, has continuously been a stockholder since that time, and is a current Intel

19  stockholder.  Plaintiff is a citizen of Florida.

20  **Nominal Defendant**

21      14.     Nominal defendant Intel is a Delaware corporation with principal executive

22  offices located at 2200 Mission College Boulevard, Santa Clara, California.  Accordingly, Intel

23  is a citizen of Delaware and California.  Intel designs and manufactures computer, networking,

24  and communication products and technologies for customers including original equipment

25  manufacturers, original design manufacturers, cloud and communications service providers, as

26  well as industrial, communications, and automotive equipment manufacturers.  As of December

27  31, 2017, the Company had 102,700 employees worldwide.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Defendants**

15.   Defendant Brian M. Krzanich ("Krzanich") is Intel's Chief Executive Officer ("CEO") and a director and has been since May 2013.  Defendant Krzanich was also Intel's Executive Vice President and Chief Operating Officer from January 2012 to May 2013; Senior Vice President and General Manager, Manufacturing and Supply Chain from January 2010 to January 2012; Vice President and General Manager, Assembly and Test from May 2006 to January 2010; and held various other positions with the Company beginning in 1982.  Defendant Krzanich is named in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Defendant Krzanich knowingly, recklessly, or with gross negligence: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.  While in possession of material, nonpublic information concerning true business health, defendant Krzanich sold 1,023,911 shares of his stock for $44,151,063.04 in proceeds.  Intel paid defendant Krzanich the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | All Other Compen-sation | Total |
|---|---|---|---|---|---|---|
| 2016 | $1,250,000 | $11,710,600 | $3,699,200 | $3,000 | $2,416,200 | $19,079,000 |

Defendant Krzanich is a citizen of California.

16.   Defendant Robert H. Swan ("Swan") is Intel's Executive Vice President and Chief Financial Officer and has been since October 2016.  Defendant Swan is named in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Defendant Swan knowingly, recklessly, or with gross negligence caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products.  Intel paid defendant Swan the following compensation as

an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $194,800 | $2,750,000 | $8,947,200 | $313,900 | $7,000 | $12,212,900 |

Defendant Swan is a citizen of California.

17.    Defendant Andy D. Bryant ("Bryant") is Intel's Chairman of the Board and has been since May 2012 and a director and has been since July 2011.  Defendant Bryant was also Intel's Vice Chairman of the Board from July 2011 to May 2012; Chief Administrative Officer from October 2007 to January 2012; Executive Vice President from December 1999 to January 2012; Chief Financial and Enterprise Services Officer from December 1999 to October 2007; Senior Vice President from January 1999 to December 1999; Chief Financial Officer from February 1994 to December 1999; and held various other positions with the Company beginning in 1981.  Defendant Bryant knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.   While in possession of material, nonpublic information concerning true business health, defendant Bryant sold 89,087 shares of his stock for $3,990,928.33 in proceeds. Intel paid defendant Bryant the following compensation as a director:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | All Other Compen-sation | Total |
|------|--------|--------------|----------------------------------------|--------------------------------------------------------------------------|-------------------------|-------|
| 2016 | $611,800 | $2,111,000 | $1,227,800 | $92,000 | $106,400 | $4,149,000 |

Defendant Bryant is a citizen of Oregon.

18.    Defendant Aneel Bhusri ("Bhusri") is Intel's Independent Lead Director and has been since May 2017 and a director and has been since June 2014.  Defendant Bhusri is also Co-Chairman of Intel's Corporate Governance and Nominating Committee and has been since at

least May 2017 and a member of that committee and has been since at least April 2017. Defendant Bhusri knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.  Intel paid defendant Bhusri the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
| --- | --- | --- |
| 2016 | $296,100 | $296,100 |

Defendant Bhusri is a citizen of California.

19.     Defendant David B. Yoffie ("Yoffie") is an Intel director and has been since 1989. Defendant Yoffie is also a member of Intel's Corporate Governance and Nominating Committee and has been since at least April 2017.  Defendant Yoffie was Co-Chairman of the Corporate Governance and Nominating Committee from at least April 2017 to at least May 2017. Defendant Yoffie knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.  While in possession of material, nonpublic information concerning true business health, defendant Yoffie sold 30,000 shares of his stock for $1,347,765 in proceeds.   Intel paid defendant Yoffie the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Change in Pension Value and Non-Qualified Deferred Compensation Earnings | Total |
| --- | --- | --- | --- | --- |
| 2016 | $120,000 | $212,200 | $11,000 | $343,200 |

Defendant Yoffie is a citizen of Massachusetts.

20.     Defendant David S. Pottruck ("Pottruck") is an Intel director and has been since December 1998.  Defendant Pottruck knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor

- 6 -

products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.   Intel paid defendant Pottruck the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $112,500 | $212,200 | $10,000 | $334,700 |

Defendant Pottruck is a citizen of California.

21.    Defendant Reed E. Hundt ("Hundt") is an Intel director and has been since May 2001.  Defendant Hundt is also a member of Intel's Audit Committee and has been since at least April 2017.  Defendant Hundt knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.  Intel paid defendant Hundt the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $110,825 | $212,200 | $323,025 |

Defendant Hundt is a citizen of Maryland.

22.    Defendant Charlene Barshefsky ("Barshefsky") is an Intel director and has been since January 2004.  Defendant Barshefsky knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.  Intel paid defendant Barshefsky the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $100,000 | $212,200 | $5,000 | $317,200 |

Defendant Barshefsky is a citizen of Washington, D.C.

23.     Defendant Frank D. Yeary ("Yeary") is an Intel director and has been since March 2009.  Defendant Yeary is also Co-Chairman of Intel's Corporate Governance and Nominating Committee and a member of that committee and has been since at least May 2017 and a member of the Audit Committee and has been since at least April 2017.  Defendant Yeary was Chairman of the Audit Committee from at least April 2017 to at least May 2017.   Defendant Yeary knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.   Intel paid defendant Yeary the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $120,000 | $212,200 | $10,000 | $342,200 |

Defendant Yeary is a citizen of California.

24.     Defendant Tsu-Jae King Liu ("Liu") is an Intel director and has been since July 2016.  Defendant Liu is also a member of Intel's Audit Committee and has been since at least April 2017.  Defendant Liu knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.  Intel paid defendant Liu the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $50,000 | $106,000 | $156,000 |

Defendant Liu is a citizen of California.

25.     Defendant Omar Ishrak ("Ishrak") is an Intel director and has been since March 2017.  Defendant Ishrak knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.  Defendant Ishrak is a citizen of Minnesota.

26.     Defendant Gregory D. Smith ("Smith") is an Intel director and has been since March 2017.  Defendant Smith is also Chairman of Intel's Audit Committee since at least May 2017 and a member of that committee since at least April 2017.  Defendant Smith knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.  Defendant Smith is a citizen of Illinois.

27.     Defendant Andrew Wilson ("Wilson") is an Intel director and has been since September 2017.  Defendant Wilson knowingly or recklessly: (i) caused or allowed Intel to disseminate improper statements concerning the security of its core chips and processor products; (ii) failed to maintain adequate disclosure procedures with respect to Intel's operations and risk management; and (iii) failed to prevent or remedy harms caused by illegal insider trading by certain directors.  Defendant Wilson is a citizen of California.

28.     Defendants Krzanich, Swan, Bryant, Barshefsky, Bhusri, Hundt, Ishrak, Liu, Pottruck, Smith, Wilson, Yeary, and Yoffie are collectively referred to as the "Individual Defendants."

29.     Defendants Krzanich, Bryant, Barshefsky, Bhusri, Hundt, Ishrak, Liu, Pottruck, Smith, Wilson, Yeary, and Yoffie are collectively referred to as the "Director Defendants."

30.     Defendants Krzanich, Bryant, and Yoffie are collectively referred to as the "Insider Trading Defendants."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

31.     Defendants Hundt, Liu, Smith, and Yeary are collectively referred to as the "Audit Committee Defendants."

## **DUTIES OF THE INDIVIDUAL DEFENDANTS**

**Management and the Board's Duties to the Company**

32.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of Intel, the Individual Defendants owed Intel and its stockholders fiduciary obligations of good faith, loyalty, candor, and care and were and are required to use their utmost ability to control and manage Intel in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefits. Each director and officer of the Company owes to Intel and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Company were required to, among other things:

(a)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

35.     In addition, certain Individual Defendants assumed enhanced duties and responsibilities through their membership on the Audit Committee.  The responsibilities of members of that committee include reviewing the adequacy of internal controls, external and internal auditing programs, business ethics, and compliance with laws, regulations, and policies that may have a material impact on the consolidated financial statements.

**Additional Duties Pursuant to the Company's Code of Conduct**

36.     Intel's Code of Conduct (the "Code") is purportedly intended to provide the "expectations for integrity and ethics" that is the foundation of the Company, and that all Intel employees and nonemployee Board members are expected to follow.  According to the Code, the Company requires all officers and directors to abide by the Company's five guiding principles of conduct:

The Codes affirms Intel's five principles of conduct:

- **Conduct business with honesty and integrity.**  Conduct business with uncomprising integrity and professionalism, demonstrating honesty and high ethical standards in all business dealing and treating customers, suppliers, distributors, and others with fairness, honesty and respect.

- **Follow the letter and spirit of the law.**  Ensure that business decisions comply with all applicable laws and regulations of the many countries in which Intel does business.

- **Treat each other fairly.**  Work as a team with respect and trust for each other.

- **Act in the best interests of Intel and avoid conflicts of interest.**  Avoid situations where our personal or family interest interfere – or even appear to interfere – with our ability to make sound business decisions in the best interest of Intel.

- **Protect the company's assets and confidential information.** Protect the value of Intel's assets, including physical assets, intellectual property, confidential information, Intel brands, and its name and reputation as well as the confidentiality of information of our customers, suppliers and employees.

37.     The Code further provides restrictions on securities trading by "[a]ny employee who is aware of material, non-public information regarding Intel."

**Breach of Duties**

38.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Intel, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

39.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its business prospects, including with respect to the security risks associated with Intel's core products.  Defendants further failed to implement proper internal controls to ensure the Company provided its customers material information about the security flaws in its chips, and to ensure that this material information was also adequately and timely disclosed to the SEC and the investing public.  These improper practices caused Intel to incur substantial damage.

40.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Intel, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Intel has expended, and will continue to expend, significant sums of money.

41.     In addition, the Individual Defendants breached their duties of loyalty and good faith to the Company by failing to prevent the insider trading by defendants Krzanich, Bryant, and Yoffie and, once completed, failed to remedy such conduct.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the

1   wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants

2   further aided and abetted and/or assisted each other in breaching their respective duties.

3        43.     During all times relevant hereto, the Individual Defendants, collectively and

4   individually, initiated a course of conduct that was designed to and did enhance the Individual

5   Defendants' executive and directorial positions at Intel and the profits, power, and prestige that

6   the Individual Defendants enjoyed as a result of holding these positions and deceive the public,

7   including stockholders of Intel, regarding the Individual Defendants' management of Intel's

8   operation.   In furtherance of this plan, conspiracy, and course of conduct, the Individual

9   Defendants, collectively and individually, took the actions set forth herein.

10       44.     Each of the Individual Defendants aided and abetted and rendered substantial

11  assistance in the wrongs complained of herein.   In taking such actions to substantially assist the

12  commission of the wrongdoing complained of herein, each Individual Defendant acted with

13  knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

14  wrongdoing, and was aware of his or her overall contribution to and furtherance of the

15  wrongdoing.

16                      **SUBSTANTIVE ALLEGATIONS**

17       45.     Intel is one of the world's largest and most-dominant producers of chips for

18  servers, desktops, and notebooks, with a combined market share of over 80%.   The Company has

19  built its reputation on the performance and security of its chips and processors.   In order to

20  satisfy the technology industry's demands for ever-increasing processing speed and efficiency,

21  Intel designs its processors to optimize performance by utilizing a technique called "speculative

22  execution."   This optimization technique has proven to have the unintended consequence of

23  introducing increased security risks to the millions of products relying on Intel processors.

24       46.     Process isolation is a fundamental tenet of computer security commonly utilized

25  in the architecture of modern computer chips.   At its core, process isolation prohibits inter-

26  process memory access.   By restricting untrusted processes on a machine to a unique space, other

27  areas of the machine containing sensitive information will be protected.   Process isolation

28

protects data by preventing other processes or applications from observing or interfering with data in other restricted areas.

47. Intel claims that its chips were designed to protect sensitive information by creating isolated spaces inside the system memory, or the machine's most "privileged inner sanctum," known as the "kernel." Within the properly isolated kernel, data can safely travel in its raw, unencrypted form safe from observation or interference from other programs running on the machine. A breakdown in isolation can make vulnerable all the sensitive information a computer possesses, such as passwords, proprietary information, or encrypted communications.

48. On or about June 1, 2017, security researchers at Google's Project Zero informed Intel of security vulnerabilities in its chips. As reported in the Company's Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K"), Intel acknowledges receiving this information. Each of the Individual Defendants signed the 2017 Form 10-K pursuant to sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX"). The Board must have known about the issues affecting millions of devices containing Intel chips making them vulnerable to attack due to the importance of this information to the Company.

49. Employing attack techniques known as Meltdown and Spectre, the Google researchers identified two major flaws in the basic architecture of Intel chips which render the existing isolation-based data protection schemes highly vulnerable. These architectural shortcomings allow malicious programs to steal data processed in the computer's kernel in violation of the norms of process isolation.

50. As reported in the Company's 2017 Form 10-K, each of the Individual Defendants signed the 2017 Form 10-K pursuant to sections 302 and 906 of SOX.

51. Whereas both the Meltdown and Spectre techniques are based on the same general principle, malicious programs gain access to higher-privileged parts of a computer's memory through Meltdown, while Spectre allows for the theft of sensitive data from the memory of other programs running on a computer.

52. According to a recent article in *Wired*, titled "A Critical Flaw Breaks Basic Security for Most Computers," Meltdown and Spectre:

[T]ake advantage of a feature in chips known as "speculative execution." When modern Intel processors execute code and come to a point in an algorithm where instructions branch in two different directions, depending on input data—whether there's enough money in an account to process a transaction, for instance—they save time by "speculatively" venturing down those forks. In other words, they take a guess, and execute instructions to get a head start. If the processor learns that it ventured down the wrong path, it jumps back to the fork in the road, and throws out the speculative work. …[W]hen Intel processors perform that speculative execution, they don't fully segregate processes that are meant to be low-privilege and untrusted from the highest-privilege memory in the computer's kernel. That means a hacker can trick the processor into allowing unprivileged code to peek into the kernel's memory with speculative execution.

53.     These flaws identified through the Meltdown and Spectre attacks are architectural in nature and therefore impact all devices containing Intel chips, including laptops, smartphones, and servers.  Further, the vulnerabilities created by this design flaw stretches to include machines operating Windows, OS X, and Android software platforms as well as cloud platforms.  In short, sensitive information contained in millions, if not billions, of devices containing Intel chips that were created since as a far back as 2005 are vulnerable to attack because of this problem.

**THE INDIVIDUAL DEFENDANTS CAUSED OR ALLOWED INTEL TO REPEATEDLY MAKE IMPROPER STATEMENTS CONCERNING THE SECURITY OF INTEL CHIPS**

54.     As detailed below, since at least July 2017, the Individual Defendants repeatedly failed to make the public aware of the security threats posed by the Meltdown and Spectre attacks during the relevant period.  Instead, Intel repeatedly touted the Company's business prospects and new product releases.  In truth, sensitive user data in most devices currently utilizing Intel chips is vulnerable to the Meltdown and Spectre methods of attack and the Company was keenly aware of this fact.

55.     On July 11, 2017, shortly after learning of the potential effects of the Meltdown and Spectre attacks, the Company held a conference call with analysts and investors to discuss the Intel Corp Purley Launch.  During the conference call, Navin Shenoy, Intel's Executive Vice President and General Manager of the Data Center Group, boasted about the "advanced security" features contained in the Company's new Xeon Scalable platform.  While discussing Intel's new

Xeon Scalable platform, Mr. Shenoy touted the products "advanced security" while completely ignoring the then-known concerns the Company had with respect to its chips:

> Today is a particularly exciting day for me. This is my first Xeon platform launch. But today isn't just another platform launch. Today, Intel is bringing the industry the biggest data center platform advancement in a decade, a platform that brings breakthrough performance, advanced security and unmatched agility for the broadest set of workloads, from traditional business applications to cloud and network services, to emerging workloads like artificial intelligence and automated driving.
>
> *   *   *
>
> And that is why I am super excited today to be introducing to all of you and the world at large, the latest addition to the Intel's data center portfolio, the Intel Xeon Scalable platform. This platform represents the best combination of leadership capabilities built on our nearly 2-decade history and heritage in developing and innovating in the data center. The Intel Xeon Scalable platform that I'm holding here in my hands includes a completely rearchitected microprocessor designed from the ground up for the data center specifically, offering greater levels of integration and workload-specific accelerators. The Xeon Scalable platform is the industry's highest performance per watt platform. It's designed for the hybrid cloud from the get go, designed for data-fueled enterprises, designed for communication service providers. You will see revolutionary leaps forward in highly efficient packet processing and security capabilities for virtual network functions, and we'll talk a little bit more about that later. It includes huge performance increases in deep learning training and in inference for customers that are beginning their AI journey.
>
> *   *   *
>
> On security, as I mentioned earlier, we've optimized on a number of levels with a 2x improvement in data encryption performance, optimized particularly for data protection, when the data's at rest, when the data's in use and when the data is in flight.

56.    On July 27, 2017, Intel filed its Quarterly Report on Form 10-Q for the second fiscal quarter ended July 1, 2017, with the SEC (the "Q2 2017 Form 10-Q").  For the second quarter, the Company reported net income of $2.8 billion, or $0.58 per diluted share, on revenue of $14.8 billion, compared to net income of $1.3 billion, or $0.27 per diluted share, on revenue of $13.5 billion for the same period in the prior year.  The Q2 2017 Form 10-Q omitted or failed to disclose that there were security issues with Intel's chips.

57. The Q2 2017 Form 10-Q contained certifications by defendants Krzanich and Swan pursuant to SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

58. On July 27, 2017, Intel issued a press release announcing record revenue of $14.8 billion for the second quarter of 2017 and raising its forecast for full year revenue and earnings per share.  The press release not only touted the Company's revenue and profit growth, but also promoted the release of new products that the Individual Defendants knew, or should have known, were vulnerable to the attacks like Meltdown and Spectre.  The press release stated:

> "Q2 was an outstanding quarter with revenue and profits growing double digits over last year," said Brian Krzanich, Intel CEO. "We also launched new Intel Core, Xeon and memory products that reset the bar for performance leadership, and we're gaining customer momentum in areas like AI and autonomous driving. With industry-leading products and strong first-half results, we're on a clear path to another record year."

59. On July 27, 2017, the Company held a conference call with analysts and investors to discuss Intel's second quarter results.  During the conference call, defendant Krzanich boasted about Intel's record revenue and launch of Xeon Scalable.   While discussing Intel's record results, defendant Krzanich never mentioned the threats posed to the Company's prospects by Meltdown and Spectre.

60. On October 26, 2017, Intel filed its Quarterly Report on Form 10-Q for the third fiscal quarter ended September 30, 2017, with the SEC (the "Q3 2017 Form 10-Q").  For the third quarter, the Company reported net income of $4.5 billion, or $0.94 per diluted share, on revenue of $16.1 billion.  The Q3 2017 Form 10-Q omitted or failed to disclose that there were security issues with Intel's chips.

61. The Q3 2017 Form 10-Q contained certifications by defendants Krzanich and Swan pursuant to SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances

under which such statements were made, not misleading with respect to the period covered by this report."

62.     On October 26, 2017, Intel issued a press release announcing its third quarter of 2017 financial results which included record operating income and record earnings per share. Intel announced revenue for the quarter of $16.1 billion, up 6% year-over-year and the Company's datacentric businesses grew 15% year-over-year.  For the third consecutive quarter, Intel raised its full-year business outlook.  According to defendant Krzanich:

> We executed well in the third quarter with strong results across the business, and we're on track to a record year. … I'm excited about our progress and our future. Intel's product line-up is the strongest it has ever been with more innovation on the way for artificial intelligence, autonomous driving and more.

### THE TRUTH EMERGES

63.     Despite the fact that Intel's Board and executive management became aware of the security vulnerability in June of 2017, Intel withheld information about the design flaw from much of the rest of the world for approximately six months.  During this time, sensitive information contained in devices utilizing Intel processors was vulnerable to attacks by the Meltdown and Spectre techniques.

64.     By January 2, 2018, initial reports of the security threat posed by Meltdown and Spectre began to appear in online media as software developers researching software updates intended to ameliorate the problem in Linux, Microsoft, and macOS operating systems began to discuss openly the issues they believed these updates were intended to solve.  These researchers were able to determine that the fixes were related to the speculative execution function performed by the processor as the security updates being released relied on Kernel Page Table Isolation, which makes the kernel invisible to running processes.  These same researchers were also quick to note that attempting to fix this hardware flaw at the software level came with a potentially substantial cost to consumers: a performance degradation of up to 30%.

65.     On January 3, 2018, following rampant speculation in the media concerning the critical security flaw, Intel confirmed the existence of the problem, though not its nature and severity, when it issued the following statement:

**Intel Responds to Security Research Findings**

Intel and other technology companies have been made aware of new security research describing software analysis methods that, when used for malicious purposes, have the potential to improperly gather sensitive data from computing devices that are operating as designed. Intel believes these exploits do not have the potential to corrupt, modify or delete data.

Recent reports that these exploits are caused by a "bug" or a "flaw" and are unique to Intel products are incorrect. Based on the analysis to date, many types of computing devices — with many different vendors' processors and operating systems — are susceptible to these exploits.

Intel is committed to product and customer security and is working closely with many other technology companies, including AMD, ARM Holdings and several operating system vendors, to develop an industry-wide approach to resolve this issue promptly and constructively. Intel has begun providing software and firmware updates to mitigate these exploits. Contrary to some reports, any performance impacts are workload-dependent, and, for the average computer user, should not be significant and will be mitigated over time.

Intel is committed to the industry best practice of responsible disclosure of potential security issues, which is why Intel and other vendors had planned to disclose this issue next week when more software and firmware updates will be available. However, Intel is making this statement today because of the current inaccurate media reports.

Check with your operating system vendor or system manufacturer and apply any available updates as soon as they are available. Following good security practices that protect against malware in general will also help protect against possible exploitation until updates can be applied.

Intel believes its products are the most secure in the world and that, with the support of its partners, the current solutions to this issue provide the best possible security for its customers.

66.     Although Intel finally acknowledged the problem publicly, after intense media scrutiny, its public statement downplayed the potential for software-based fixes to substantially degrade a device's performance.  Later that day, however, Ronak Singhal, Intel's Director of CPU Computer Architecture, admitted:

…There are other workloads that spend a lot of time going back and forth between the application and the operating system. And those are the types of workloads where you can see higher levels of impact based on the mitigations that have been put in place. And so there are, for instance, synthetic workloads that

have shown 30% or more performance impact as a result. But the statements that Steve made on performance are around, if you look at the broad spectrum of workloads as well as taking into account real-world scenarios, you get to that level of impact.

67.     Mr. Singhal's estimate of potential performance impact mirrors that offered in an article published by *The Register*, on the previous day, January 2, 2018.  According to the article, the operating system updates necessary to address the vulnerability would likely result in "a ballpark figure of five to 30 percent slow down, depending on the task and the processor model," for Intel-based computing devices.

68.     Following the disclosures made on January 3, 2018, Intel's share price fell $1.59, or over 3.3%, to close at $45.26 per share on that day, a market cap loss of over $7.4 billion.

69.     Importantly, the sacrifice of processing speed for the sake of security has both financial and reputational implications of Intel, as the Company has long promoted its core products to be both fast and secure.

70.     Although Intel withheld from the public and the Company's investors the nature and the extent of the problem for as much as six months, during that time, Intel did, however, inform a small group of its customers, including the Chinese companies Lenovo and Alibaba, about the security flaws found in Intel's chips.  Notably absent from this group that the Company chose to inform early were arguably some of Intel's most security sensitive customers, the United States Department of Homeland Security and the National Security Administration; both of which rely on Intel's technology to protect national security. These two important agencies only learned about the issue through Intel's public statement.

71.     Intel's selective disclosure benefited a few of its customers by allowing them to begin developing a fix before information of the security flaw became widespread.  Likewise, Intel's selective disclosure denied other customers that same opportunity.

72.     Further, despite numerous projections by industry and software analysts to the contrary, Intel also sought to downplay the financial impact of the security flaw to the Company. During the January 3 conference call, Stephen Smith, Corporate Vice President and General

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Manager of Data Center Engineering, explained that Intel did "not expect any financial implication around Intel's product as a result of this one."

73.     Intel's projection of no financial impact was immediately received with skepticism by financial and software analysts alike.  As one analyst noted, a 10% performance degradation attributable to the software fix among cloud customers would translate into a 10% increase in computing resources to overcome the performance problem.  This is a cost that such large-scale customers would seek to pass on to Intel.  Such costs would be in addition to any potential recall related costs, loss of market share to competitors, or delay in future product releases associated with fixing the problem.

74.     Finally, despite its initial proclamation that delaying the announcement enabled the Company and others the time necessary to provide the proper fixes, Intel struggled to provide users with a competent fix well into February 2018.  Indeed, on January 22, 2018, Intel encouraged users to stop deploying a patch created to address Spectre because the fix sometimes caused computers to spontaneously reboot. In light of this problem, Executive Vice President Navin Shenoy recommended users skip the patches until a better version could be deployed. "We recommend that [original equipment manufacturers], cloud service providers, system manufacturers, software vendors, and end users stop deployment of current versions on specific platforms," Mr. Shenoy stated, "as they may introduce higher than expected reboots and other unpredictable system behavior."  Then, on February 21, 2018, Intel rolled out patches for 6th, 7th, and 8th generation Intel core processors.  Whether or not those fixes solve the problem is still unknown.

## REASONS THE STATEMENTS WERE IMPROPER

75.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     that the continued use of Intel chips in devices posed serious risks to the security of data held on those devices; and

(b)     as a result of the foregoing, the officers' and directors' representations

concerning the security of Intel's chips and its prospects were improper.

**THE INSIDER TRADING DEFENDANTS TAKE ADVANTAGE OF THE
COMPANY'S FAILURE TO IMEDIATELY DISCLOSE THE SECURITY FLAW**

76.    During the six-month period when Intel withheld information about the security threat, insiders sold massive amounts of their personally held Company stock.

77.    Defendant Krzanich sold Intel shares and exercised stock options on November 29, 2017, worth a total $39 million, realizing a profit of nearly $25 million. This sale occurred during the period Intel executives and its Board were aware of security vulnerabilities in its chips, but before that information was made public. Those sales would draw the attention of United States Senators Jack Reed and John Kennedy who were troubled by the transactions.  In a letter dated January 9, 2018, sent to the U.S. Department of Justice and SEC, the Senators requested that those agencies investigate the propriety of the sale by Intel's CEO.

78.    In the letter, the Senators expressed deep concern for the potential violations of insider trading law as a result of the apparent irregularities in the timing and volume of defendant Krzanich's trades.  The Senators wrote:

Dear Chairman Clayton and Attorney General Sessions:

We write to request that the Securities and Exchange Commission and the Department of Justice investigate the alarming reports that Intel's Chief Executive Officer sold more than $20 million of his Intel securities on November 29, 2017.  While news reports suggest that these securities were sold pursuant to an automatic trading plan, known as a Rule 10b5-1 plan, we are disturbed by additional reports that the instructions for these securities transactions were adopted on October 30, 2017, which is before the public was made aware of serious cybersecurity flaws in Intel's chips but months after Google informed Intel in June of these security vulnerabilities.

These reports are troubling not only because of the risk to nearly all phones and computers, but also because these reports raise concerns of potential insider trading.  We request that you conduct a thorough examination of whether any insider trading laws were violated.  Furthermore, if you uncover such violations through your examination, we expect you to enforce our laws to the fullest extent possible.

79.    As the Senators make clear, defendant Krzanich's October 30, 2017 decision to change his 10b5-1 trading plan (through which he sold prearranged numbers of shares at

- 22 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

prearranged times since at least 2015) while in possession of material, nonpublic information about the Company is particularly suspicious.

80.     Defendant Krzanich was not the only Intel insider to profit from the sale of Company shares during the relevant period while in possession of potentially negative, material, and nonpublic information.  On October 30, 2017, defendant Yoffie sold 30,000 shares of Intel stock and received approximately $1.35 million.   On that same day, defendant Bryant sold 89,087 Intel shares for nearly $4 million.

81.     The Intel Board was made aware of timing and the size of each of the insider sales as they were all reported contemporaneously to the SEC using Form 4, Statement of Changes in Beneficial Ownership of Securities.

82.     Because these transactions occurred during the time when the Intel Board members were in possession of nonpublic, material information that could have had negative implications for the Company's business prospects, those employees had a legal duty and a fiduciary obligation to Intel to refrain from making such transactions.  Moreover, the Intel Board had a duty to limit the abuse of nonpublic information by insiders.

83.     To date, the Board has made no attempt to investigate this serious accusation. Instead, despite the suspiciousness of the trades, Intel has stated publicly that defendant Krzanich's stock trades were "unrelated" to the security revelations and made pursuant to the previously scheduled trading plan.  The Company and the Board, however, have not addressed that the schedule for those sales was established on October 30, 2017, five months after Intel became aware of the vulnerabilities.

## DAMAGES TO INTEL CAUSED BY THE INDIVIDUAL DEFENDANTS

84.     As a result of the Individual Defendants' improprieties, Intel marketed and sold defective products that exposed its customers to significant security flaws.  Intel's fiduciaries disseminated improper, public statements concerning its products' safety and performance. These improper statements provided the public, including investors, with an inflated impression of the Company's business prospects and operations.  These improper statements have devastated

Intel's credibility as reflected by the Company's two-day market capitalization loss following the disclosure of more than $11.3 billion, or 5.1%.

85. Intel's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Intel's current and potential customers consider a company's trustworthiness, stability, and ability to accurately describe its products' performance and safety. Intel's ability to win new customers is now impaired.

86. As a direct and proximate result of the Individual Defendants' actions, Intel has expended and will continue to significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending Intel in the thirty consumer class action lawsuits that have been filed against Intel over the issue and two securities class action lawsuits, plus potentially billions of dollars in settlement or to satisfy adverse judgments;

(b) costs incurred from any government investigation; and

(c) costs incurred in compensating and paying benefits to the Individual Defendants who breached their fiduciary duties to Intel and damaged the Company.

87. Defendants' actions have irreparably damaged Intel's corporate image and goodwill. Customers will be loath to enter into contracts with the Company under the same terms as in the past since the reliability of its chip design will be in question.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

88. Plaintiff brings this action derivatively in the right of and for the benefit of Intel to redress injuries suffered and to be suffered by Intel. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

89. Plaintiff will adequately and fairly represent the interests of Intel in enforcing and prosecuting its rights.

90. Plaintiff was a stockholder of Intel at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Intel stockholder.

91. At the time of this filing, Intel's Board consists of twelve members: defendants Barshefsky, Bhusri, Bryant, Hundt, Ishrak, Krzanich, Liu, Pottruck, Smith, Wilson, Yeary, and

Yoffie.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Current Intel Board Faces a Substantial Likelihood of Liability for Their Misconduct**

92.     Director defendants Barshefsky, Bhusri, Bryant, Hundt, Ishrak, Krzanich, Liu, Pottruck, Smith, Wilson, Yeary, and Yoffie breached their fiduciary duties of loyalty by causing or allowing improper statements in the Company's press releases and SEC filings regarding Intel's chips, which presented undisclosed security risks.  As reported in the Company's 2017 Form 10-K, the security researchers at Google's Project Zero informed the Company in June 2017 of security vulnerabilities in its chips.  Each of the Individual Defendants signed the 2017 Form 10-K pursuant to SOX.  Therefore, the Board must have known about the issues effecting millions of devices containing Intel chips making them vulnerable to attack due to the importance of this information to the Company.  In addition, after Intel learned about the flaw in its chips, it began working with numerous companies, including its direct competitor, Advanced Micro Devices, Inc.  It could only have worked with those companies with the approval of the Board.  Further, the approval to share the highly sensitive information about Intel's chips' securities flaws with only a limited set of companies must have come from the Board.  Therefore, despite knowing about the security flaws in Intel's chips, defendants Barshefsky, Bhusri, Bryant, Hundt, Ishrak, Krzanich, Liu, Pottruck, Smith, Wilson, Yeary, and Yoffie allowed the continued improper statements and failure to inform the public, in breach of their fiduciary duties.

93.     Further, the Director Defendants also knew or should have known that defendants Krzanich, Bryant, and Yoffie engaged in illegal insider trading while in possession of material, nonpublic information, and yet failed to prevent such insider trading or to make any attempt to remedy the insider trading once they became aware.  In particular, the Director Defendants knew or should have known, as of December 1, 2017, defendant Krzanich's sizeable sales of Intel stock made on November 29, 2017, were made pursuant to his 10b5-1 trading plan amended on October 30, 2017.  The timing of the amendment and the size of the trade made defendant

1  Krzanich's trading particularly suspect.  The Director Defendants breached their fiduciary duties

2  of loyalty and good faith by failing to remedy such insider trading and they prejudged any

3  demand by concluding that defendant Krzanich's stock trades were "unrelated" to the security

4  revelations.  Because all of the Director Defendants face a substantial likelihood of liability for

5  their failure to remedy the insider trading, demand as to them is futile.

6       94.    The Audit Committee of Intel is composed of defendants Hundt, Liu, Smith, and

7  Yeary.  Defendant Hunt has served as a member of the Audit Committee since at least April

8  2017.  Defendant Liu has served as a member of the Audit Committee since at least April 2017.

9  Defendant Yeary has served as a member of the Audit Committee since at least April 2017.

10  Defendant Smith is also the Chairman of the Audit Committee and has been since at least May

11  2017 and a member since at least April 2017.  The Audit Committee of the Board is responsible

12  by its Charter for, among other things, assisting the Board in its general oversight of the

13  Company's accounting and financial reporting processes, audits of the financial statements,

14  internal control and audit functions, and compliance with legal and regulatory requirements and

15  ethical standards adopted by the Company.  Thus, the Audit Committee Defendants were

16  responsible for knowingly or recklessly allowing the improper statements related to the

17  Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit

18  Committee Defendants reviewed and approved the improper press releases made to the public.

19  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these

20  improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary

21  duty of loyalty and good faith because they participated in the wrongdoing described herein.

22  Thus, defendants Hundt, Liu, Smith, and Yeary face a substantial likelihood of liability for their

23  breach of fiduciary duties so any demand upon them is futile.

24  **Demand Is Excused as to Defendants Krzanich, Bryant, and Yoffie**

25       95.    Defendant Krzanich lacks independence according to objective and subjective

26  tests established by NASDAQ as identified in Intel's 2017 Proxy Statement.  The principal

27  professional occupation of defendant Krzanich is his employment with Intel, pursuant to which

28  he has received and continues to receive substantial monetary compensation and other benefits as

alleged above.   Accordingly, defendant Krzanich lacks independence from defendants Barshefsky, Bhusri, Bryant, Hundt, Ishrak, Liu, Pottruck, Smith, Wilson, Yeary, and Yoffie due to his interest in maintaining his executive position as CEO at Intel.  This lack of independence renders defendant Krzanich incapable of impartially considering a demand to commence and vigorously prosecute this action.  Further, defendant Krzanich engaged in insider trading during the relevant period, wherein he realized a profit of nearly $25 million when he sold Intel shares and exercised stock options worth a total $39 million, based on material, nonpublic information concerning the flaws in the basic architecture of Intel chips that would allow malicious programs to steal sensitive user data, such as passwords, proprietary information, or encrypted communications.   Defendant Krzanich therefore faces a substantial likelihood of personal liability and is unable to consider demand impartially.

96.   Defendant Bryant lacks independence according to objective and subjective tests established by NASDAQ as identified in Intel's 2017 Proxy Statement.  Accordingly, defendant Bryant lacks independence.  This lack of independence renders defendant Bryant incapable of impartially considering a demand to commence and vigorously prosecute this action.  Further, defendant Bryant engaged in insider trading during the relevant period, wherein he sold Intel shares worth nearly $4 million, based on material, nonpublic information concerning the flaws in the basic architecture of Intel chips that would allow malicious programs to steal sensitive user data, such as passwords, proprietary information, or encrypted communications.   Defendant Bryant therefore faces a substantial likelihood of personal liability and is unable to consider demand impartially.

97.   Defendant Yoffie engaged in insider trading during the relevant period, wherein he sold 30,000 shares of Intel stock and received approximately $1.35 million based on material, nonpublic information concerning the flaws in the basic architecture of Intel chips that would allow malicious programs to steal sensitive user data, such as passwords, proprietary information, or encrypted communications.   Defendant Yoffie therefore faces a substantial likelihood of personal liability and is unable to consider demand impartially.

98.     Plaintiff has not made any demand on the other stockholders of Intel to institute this action since such a demand would be a futile and useless act for the following reasons:

(a)     Intel is a publicly held company with over 4.6 billion shares outstanding and thousands of stockholders;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.     The Individual Defendants owed and owe Intel fiduciary obligations.

101.     By reason of their fiduciary relationships, the Individual Defendants owed and owe Intel the highest obligation of good faith, fair dealing, loyalty, and due care.

102.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

103.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company and failed to ensure that Intel complied with applicable laws, rules, and regulations. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

104.     In utter and complete disregard for their fiduciary duties, the Individual Defendants willfully ignored the obvious and pervasive problems with Intel and failed to make a good faith effort to correct the problems or prevent their recurrence.

105.     Each of the Individual Defendants failed to assert claims on behalf of Intel. The failure to assert these claims against executives and directors, to breach their fiduciary duties.

106.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Intel has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets:

(a)    by failing to properly consider the interests of the Company and its public stockholders;

(b)    by failing to conduct proper supervision;

(c)    by paying bonuses to certain of its executive officers; and

(d)    by incurring potentially billions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

109.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

110.    Plaintiff, on behalf of Intel, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

111.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Intel.

113.    Plaintiff, as a stockholder and representative of Intel, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment against defendants as follows:

A.     Against all of the defendants and in favor of Intel for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing Intel to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Intel and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote the following Corporate Governance Policies:

1.     a proposal to strengthen the Company's development and design of chips for increased security;

2.     a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and public;

3.     a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4.     a provision to permit the stockholders of Intel to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Intel has an effective remedy;

D.     Awarding to Intel restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff reasonable attorneys' fees, consultant and expert fees, costs and expenses; and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    F.    Granting such other and further relief as the Court deems just and proper.

2                                **JURY DEMAND**

3        Plaintiff demands a trial by jury.

4    Dated: March 8, 2018                    ROBBINS ARROYO LLP
                                             BRIAN J. ROBBINS
5                                            FELIPE J. ARROYO
                                             STEVEN R. WEDEKING
6

7                                                /s/*Brian J. Robbins*
                                             BRIAN J. ROBBINS
8
                                             600 B Street, Suite 1900
9                                            San Diego, CA 92101
                                             Telephone: (619) 525-3990
10                                           Facsimile (619) 525-3991
                                             E-mail: brobbins@robbinsarroyo.com
11                                                   farroyo@robbinsarroyo.com
                                                     swedeking@robbinsarroyo.com
12
                                             Attorneys for Plaintiff
13

14

15

16

17

18

19

20

21

22

23

24

25

26   1247427

27

28

                                    - 31 -
            VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

VERIFICATION

I, Joseph Lipovich, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 3/7/18

JOSEPH LIPOVICH